UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                      Plaintiff,<br><br>v.<br><br>JORDAN BAXTER and<br>ROLANDO RODRIGUEZ,<br><br>                      Defendants. | Case No. 13-CR-186-JPS<br><br><br><br>ORDER |

On October 17, 2013, Defendant Jordan Baxter filed a motion to suppress statements she made during several interviews that took place following the bank robbery for which she is now under indictment. (Docket #19). Magistrate Judge Aaron E. Goodstein issued his report and recommendations on November 7, 2013. (Docket #26). The Court thereafter spoke with Ms. Baxter's counsel who agreed to shorten his otherwise-allotted time to file objections to Magistrate Goodstein's report and recommendations, in order to allow the Court to address the objections and report and recommendations before the plea agreement cutoff date. The Court shortly thereafter entered an order in that regard, and Ms. Baxter filed her objections on November 14, 2013 to which the Government responded. (Docket #27; #28; #29). The Court has reviewed Ms. Baxter's submission and now adopts Magistrate Goodstein's report and recommendations.

1.    STANDARD OF REVIEW

When reviewing a magistrate's recommendation, the Court is obliged to analyze the recommendation *de novo.* 28 U.S.C. § 636(b)(1)(C). Thus, the Court can "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* In other words, the Court's

*de novo* review of Magistrate Goodstein's findings and recommendations is not limited to his legal analysis alone; rather, the Court may also review his factual findings, and accept, reject, or modify those findings as it sees fit based upon the evidence. *Id.*

2. BACKGROUND

The police in this case conducted three separate interviews with Ms. Baxter, two of which she challenges. The Court sets forth the circumstances of each interview separately, as follows.

2.1 Officers' Arrival On Scene and First Bank Interview

According to the charges in the Indictment, on August 6, 2013, the Greendale, Wisconsin, branch of PNC Bank was robbed. (Docket #12). Ms. Baxter was an employee of PNC at the time and was the teller who was held up by the robber. (Docket #26, at 2).

Greendale Police Detective Jeremy Vlaj responded to the scene and shortly thereafter interviewed Ms. Baxter for approximately twenty to thirty minutes, beginning at approximately 11:30 a.m. (Docket #26, at 2). This first interview was very informal and occurred in one of the personal offices of a bank employee. (Docket #26, at 2). Detective Vlaj did not view Ms. Baxter as a suspect at this time; he still viewed her only as the teller who was held up by the robber, and wished to get a description of the robber from her. (Docket #26, at 2).

2.2 Second Bank Interview

Detective Vlaj's view of Ms. Baxter changed shortly thereafter: bank officials calculated that the amount stolen by the robber was unusually high, prompting Detective Vlaj to view Ms. Baxter as a potential accomplice of the robber. (Docket #26, at 2). That suspicion, further supported by his discovery that Ms. Baxter had allegedly been experiencing financial problems,

prompted Detective Vlaj to request a second interview with Ms. Baxter. (Docket #26, at 2).

Ms. Baxter was still present on scene because the bank remained on lockdown at the request of bank executives, meaning that employees could not leave and customers could not enter; when approached, she voluntarily agreed to this second interview. (Docket #26, at 2–3). The interview occurred at approximately 2:00 p.m., and took place in a different bank employee's office. Detective Vlaj invited a second Greendale Police Detective, Matthew Borkowski, to join him in conducting the interview. (Docket #26, at 2). The office in which this second interview occurred was adjacent to the bank's lobby and had large windows and a door. (Docket #26, at 2). Ms. Baxter testified at the evidentiary hearing that the door to the office was closed throughout the interview, but Detectives Vlaj and Borkowski provided contradictory testimony and Magistrate Goodstein accepted their testimony. (Docket #26, at 2, 7). Detective Vlaj had interviewed several other bank employees in this room earlier in the day. (Docket #26, at 2).

The detectives' interview of Ms. Baxter, however, turned somewhat accusatory. (Docket #26, at 2–3). Detective Borkowski, in particular, addressed several accusations towards Ms. Baxter. (Docket #26, at 2). He told Ms. Baxter that he believed she had something to do with the robbery because: (1) she had an abnormally large amount of money in her drawer at the time of the robbery; and (2) she was eating more food than is typical for someone who had recently been held at gunpoint. (Docket #26, at 2). At the evidentiary hearing, Ms. Baxter testified that both detectives, and particularly Detective Borkowski, were very hostile in questioning her during this interview. (Docket #26, at 2–3). The detectives disagreed, and testified that they never raised their voices during this interview. (Docket #26, at 3).

Nonetheless, Magistrate Goodstein largely accepted Ms. Baxter's testimony that the questioning was hostile and the detectives raised their voices. (Docket #26, at 8). He did not, however, accept all of Ms. Baxter's assertions regarding the alleged high intensity of that hostility (such as Detective Borkowski's alleged yelling and other demonstrations of frustration). (Docket #26, at 8). Ms. Baxter testified that this hostility caused her to become upset and start crying, because she believed she had no choice but to remain with the detectives and talk. (Docket #26, at 2). The detectives, however, ultimately allowed her to leave after telling her they would be in contact with her. (Docket #26, at 3).

### 2.3 Third Interview at Station

Both Ms. Baxter and the detectives left the bank. The detectives returned to the Greendale Police Department station. (Docket #26, at 3). Several hours passed, and Detective Vlaj decided to contact Ms. Baxter to request that she come to the station for an additional interview. (Docket #26, at 3). Detective Vlaj called Ms. Baxter and left a voicemail message for her, in which he told her that he would like her to come to the station to examine a picture. (Docket #26, at 3). Ms. Baxter returned the call, at which time Detective Vlaj told her that the detectives would like to ask her more questions. (Docket #26, at 3). She agreed to come to the station for additional questioning. (Docket #26, at 3). She apparently got lost along the way, requiring her to make several additional calls to Detective Vlaj for directions, but eventually arrived at approximately 6:00 p.m. (Docket #26, at 3).

When Ms. Baxter arrived, the detectives greeted her in the police station lobby. (Docket #26, at 3). They informed her that they wished to question her about some discrepancies in her statements, and explained that they would like to question her in the booking portion of the station—the

detectives actually testified that they called it the "lock-up" section—because it was the only area of the station with recording capabilities. (Docket #26, at 3).[1]

The booking area is a secure facility where even officers do not carry guns. (Docket #26, at 3). Thus, before taking Ms. Baxter to the booking area, the detectives asked her if she had any weapons, but they did not pat her down. (Docket #26, at 3). Detective Vlaj testified that he advised Ms. Baxter that she was not under arrest, and Magistrate Goodstein accepted this testimony as true. (Docket #26, at 3, 9).

After asking her whether she was holding any weapons, the detectives led Ms. Baxter to the booking area. (Docket #26, at 4). To do so, the detectives were required to take Ms. Baxter on a circuitous route: first, they took her through a locked door adjoining the lobby; from there, they took her to an elevator and down one floor to the lower level; finally, they traveled down a hallway and passed through another locked door to enter the booking area. (Docket #26, at 4). This final door closed and locked behind her, preventing her from leaving the booking area without the assent of the detectives. (Docket #26, at 4).

Once in the booking area, the detectives took Ms. Baxter into a separate, smaller room, which Magistrate Goodstein referred to as the "booking room." (Docket #26, at 4). The booking room is a much smaller, concrete room, inside of which is only a pair of metal stools and a metal table. (Docket #26, at 4). Ms. Baxter testified that the door to this room was closed

---

[1]Unfortunately, the recording apparently failed for various reasons, and so neither Magistrate Goodstein nor this Court had the benefit of a recording of the interview to review in addressing Ms. Baxter's motion to suppress. (Docket #26, at 5).

during the interview, but the detectives testified it was open (Docket #26, at 4); Magistrate Goodstein did not decide which account he believed when he issued his report and recommendations.

The detectives began interviewing Ms. Baxter, and it immediately became clear that they suspected her of being an accomplice to the crime. (Docket #26, at 4). Ms. Baxter described Detective Borkowski as being particularly aggressive and accusatory towards her, and Magistrate Goodstein concurred that Detective Borkowski's conduct was combative in his questioning. (Docket #26, at 4, 8). Ms. Baxter, however, never requested a break in the interview. (Docket #26, at 4). The interview progressed for approximately 45 minutes, at the end of which time Ms. Baxter began crying and said she had nothing further to say. (Docket #26, at 4, 9). The detectives then walked Ms. Baxter out of the booking room and back through the police station, and allowed her to leave. (Docket #26 at 4–5).

3.  DISCUSSION

At no point during this interview (nor during her second interview at the bank) did the detectives provide Ms. Baxter with *Miranda* warnings. During those two latter interviews, she allegedly made inconsistent statements, which are now the subject of her motion to suppress.

Ms. Baxter does not seek to suppress the statements she made during the first interview at the bank (*see* Docket #19), therefore, the Court will address only the latter two interviews to determine whether it should suppress the statements Ms. Baxter made therein.

    3.1    General Law on Suppression of Statements Made without *Miranda* Warnings

In *Miranda v. Arizona*, the Supreme Court held that the government "may not use statements stemming from the custodial interrogation of a

defendant unless the government has utilized procedural safeguards effective to secure the privilege against self incrimination." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012) *cert. denied*, 133 S. Ct. 249 (2012) (citing *Miranda*, 384 U.S. 436 (1966); *Berkemer v. McCarty*, 468 U.S. 420, 428 (1984)). Thus, generally, if an individual is in custody and subject to interrogation, law enforcement officers must provide that individual with certain warnings before taking the individual's statement; failure to provide those warnings often results in the suppression of any statements the individual made during the custodial interrogation, so as to protect the individual's right to be free from self-incrimination. *See, e.g., Berkemer*, 468 U.S. at 428; *J.D.B. v. North Carolina*, --- U.S. ----, 131 S. Ct. 2394, 2401 (2011); *Ambrose*, 668 F.3d at 954. Of course, this does not mean that law enforcement officers must provide *Miranda* warnings before *every* conversation they may have with any given individual, even if the individual is a suspect or the focus of a criminal investigation. *United States v. Barker*, 467 F.3d 625, 628 (7th Cir. 2006). Rather, the *Miranda* court was concerned with the "inherently coercive nature of custodial interrogation," and therefore suppression of statements made without a *Miranda* warning turns on whether the statements were made while the individual was: (1) in custody; and (2) subject to interrogation. *Ambrose*, 668 F.3d at 954 (citing *Berkemer*, 468 U.S. at 428; *Miranda*, 384 U.S. at 444; *Barker*, 467 F.3d at 628).

"A person is 'in custody' for *Miranda* purposes if there was a formal arrest or a restraint on his or her freedom of movement of the degree associated with formal arrest." *Ambrose*, 668 F.3d at 954 (citing *J.D.B.*, 131 S. Ct. at 2402; *United States v. Podhorn*, 549 F.3d 552, 556 (7th Cir. 2008)). This requires the Court to perform an objective test to determine how a "reasonable person in the suspect's position would have understood the

situation." *Ambrose*, 668 F.3d at 954 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004); *Podhorn*, 549 F.3d at 556; *J.D.B.*, 131 S. Ct. at 2402). To answer this question, the Court must first gauge the circumstances surrounding the suspect's statements. *Ambrose*, 668 F.3d at 954–55 (citing *J.D.B.*, 131 S. Ct. at 2402; *Podhorn*, 549 F.3d at 556). Specifically, the Court should look to the following seven circumstances:

> (1) whether the encounter occurred in a public or private place;
>
> (2) whether the suspect consented to speak with the officers;
>
> (3) whether the officers informed the individual that he or she was not under arrest;
>
> (4) whether the individuals were moved by the officers from one place to another;
>
> (5) whether there was a threatening presence of several officers and a display of weapons or physical force;
>
> (6) whether the officers deprived the suspect of documents needed to depart; and
>
> (7) whether the tone of the officers' voices was such that their requests would likely be obeyed.

*Ambrose*, 668 F.3d at 956 (citing *Barker*, 467 F.3d at 629). This list is generally indicative of the circumstances that the Court should examine, but it is not exhaustive, nor is each circumstance required for the Court to determine that a suspect's statements should be suppressed. *Ambrose*, 668 F.3d at 956 (citing *J.D.B.*, 131 S. Ct. at 2402; *Podhorn*, 549 F.3d at 556). Rather, the Court must closely examine those circumstances and any others surrounding the situation, and determine whether a reasonable person in the same circumstances would have believed that he or she was "at liberty to terminate the interrogation and leave." *Ambrose*, 668 F.3d at 954–55, 956 (citing *J.D.B.*, 131 S. Ct. at 2402; *Podhorn*, 549 F.3d at 556). The suspect's

subjective state of mind during the questioning does not control the Court's objective analysis, but "*may* be considered as circumstantial evidence of 'the atmosphere and how that would impact a reasonable person's perception' of the questioning." *United States v. Pelletier*, 700 F.3d 1109, 1115 (7th Cir. 2012) (quoting *Ambrose*, 668 F.3d at 959).[2]

If the Court determines that Ms. Baxter was in custody, then it must turn to the second inquiry: whether Ms. Baxter was subject to interrogation. *Ambrose*, 668 F.3d at 955. Even if an individual is in custody, the Court should not suppress his or her statements to law enforcement officers unless those statements resulted from "questioning by the officers or any words or actions that the officers know or should know are reasonably likely to elicit an incriminating response. *Id.* (citing *United States v. Swanson*, 635 F.3d 995, 1002 (7th Cir. 2011); *United States v. Richardson*, 657 F.3d 521, 525 (2011); *United States v. Knope*, 655 F.3d 647, 652 (7th Cir. 2011)).

### 3.2 Application of Law to Facts

With that general legal backdrop, the Court now turns to examining the two separate sessions of questioning that Ms. Baxter challenges. Applying the above-discussed general law, in addition to several more fact-specific cases, the Court determines that Ms. Baxter was not in custody for *Miranda* purposes during either session. As such, the detectives' failure to provide Ms. Baxter with *Miranda* warnings does not affect the admissibility

---

[2]In her objections, Ms. Baxter twice argues that, because she was a suspect in the robbery and knew of that fact, the Court should find that she was in custody. (Docket #28, at ¶¶ 1, 3). However, neither her subjective state of mind nor the detectives' are dispositive, *Pelletier*, 700 F.3d at 1115; *Ambrose*, 668 F.3d at 959. Moreover, the Court has considered those circumstances as part of its multi-factor test and determines that they do not impact the outcome.

of the statements, and the Court is obliged to deny Ms. Baxter's motion to suppress the statements.

### 3.2.1 Second Interview Session at Bank

The detectives' second interview session with Ms. Baxter at the bank was certainly much closer to a custodial interrogation than the first interview had been. The following circumstances bring the second interview much closer to the threshold: (1) there were two detectives interviewing Ms. Baxter during the second interview, as opposed to one; (2) the detectives had begun to suspect Ms. Baxter of playing a role in the robbery and were more openly hostile in addressing accusatory questions and statements to Ms. Baxter; (3) arguably, the door to the office in which the interview took place was closed; (4) Ms. Baxter had been waiting in the bank for a fairly long time, because the bank remained on lockdown; and (5) Ms. Baxter allegedly believed she was not free to leave the interview.

Despite those circumstances, the Court must ultimately determine that the second bank interview was not custodial. To begin, the interview occurred in a mostly public place. The bank was, of course, on lockdown, making it perhaps somewhat less public. But, a short time before the second interview occurred, the bank managers had ordered pizza and allowed delivery drivers to enter the facility to deliver the pizzas. And, while the Court will accept Ms. Baxter's assertion that the door to the room in which the questioning took place was closed, that fact is counterbalanced by the fact that the office had many large windows and was directly connected to the lobby in which all of the other employees remained. *See Ambrose*, 668 F.3d at 957 ("The tenth floor, however, was an active floor with many people and thus there was no aspect of isolation."). Ultimately, the Court finds that the location of the questioning occurred in a public place.

The fact that the bank was on lockdown does not change that analysis. To begin, the Court agrees with Magistrate Goodstein that a lockdown, during which time all bank employees were subject to multiple interviews, would not necessarily seem out of the ordinary to any person who had just witnessed a robbery. (Docket #26, at 6–7). It would be logical to restrict access to a crime and also to interview the witnesses to the crime immediately thereafter, and therefore the Court does not believe that any of those restrictions would cause a reasonable person to believe that he or she was in custody. Moreover, the Court also notes that the remainder of the bank employees were also still being detained at the time of the second interview. *Ambrose*, 668 F.3d at 956 (because requirement to relinquish weapons, phones, keys, and other personal effects was uniformly applied, the fact that such requirement was imposed upon suspect did not weigh in favor of a finding of custody). Given the fact that there were still many bank employees being held on lockdown for the purpose of potential interviews, the Court finds that no reasonable person in the same situation would believe himself or herself to be in custody.[3]

The remainder of the circumstances also augur in favor of a finding that a reasonable person in Ms. Baxter's situation would not believe that he or she was in custody. It is unclear whether Ms. Baxter explicitly consented to speak with the detectives or whether the detectives told her that she was not under arrest, but likewise there is nothing in the record to indicate that

---

[3]Ms. Baxter, in her objections, argues that the fact that the bank managers—as opposed to law enforcement officers—ordered the lockdown should not be considered in support of the Government's position. (Docket #28, at ¶ 2). The Court does not rely on that fact in reaching its conclusion, and therefore does not find it necessary to address this argument.

Ms. Baxter objected to the second interview in any way. And, while the detectives were allegedly hostile in their tone of voice and informed Ms. Baxter that they viewed her as a potential suspect, those facts do not raise the situation to the level of a custodial interrogation. The detectives were not required to provide Ms. Baxter with *Miranda* warnings simply because she was a potential suspect. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). Further, any general hostility that the detectives displayed towards her was not of an extremely coercive nature: there is nothing in the record that would establish that they displayed their weapons or threatened the use of physical force, nor did they even intone that Ms. Baxter must comply with their requests. They did not move Ms. Baxter from one place to another nor deprive her of her ability to depart. In fact, when Ms. Baxter became upset during the second interview, the detectives allowed her to leave.

In sum, in consideration of the totality of the circumstances, the Court is obliged to conclude that any reasonable person in the same situation as Ms. Baxter during the second interview at the bank would not believe that he or she was in custody. Accordingly, Ms. Baxter, herself, was not in custody during that second interview, and the Court must deny her motion to suppress the statements obtained by the detectives during that interview.

### 3.2.2 Interview at Police Station

The detectives' third session of questioning Ms. Baxter—the only session to occur at the police station—is an even closer call. However, the Court ultimately finds that Ms. Baxter was not in custody for this session, either, and it must deny her motion to suppress in that regard.

The Court will begin by pointing out the circumstances that clearly weigh in favor of a finding that Ms. Baxter was not in custody. To begin, she voluntarily consented to speak with the detectives. The detectives clearly

informed her that they wanted her to visit them at the station to answer questions, and Ms. Baxter knew that she was a suspect. The detectives, however, had not arrested her, and instead merely requested that she visit them at the station. They even allowed her to bring her car, which implies that they would also allow her to leave at the end of the interview. That fact also shows that the detectives did not transport Ms. Baxter from one place to another in their squad cars.[4] Rather, Ms. Baxter was free to arrive at the police station at her convenience—in fact, she got lost several times and called for directions. When Ms. Baxter finally arrived at the station, the officers informed her that she was not under arrest. They then took her to the booking area, in which firearms were not allowed, and so clearly the officers could not have displayed their weapons to her to imply the possibility of physical force. Throughout this period, only Detectives Vlaj and Borkowski were present, so there also was not a threatening presence of several officers. Finally, though the detectives had to escort Ms. Baxter out of the building to allow her to leave, there is no indication that they prevented her departure in any way. They did not tell her that she could not leave or threaten to keep her downstairs in the booking room until she talked. In fact, when Ms. Baxter eventually became upset, the officers escorted her out of the building and let her go on her way, after a relatively short hearing of approximately 45 minutes. In all, these facts would lead any reasonable person to believe that he or she was not in custody.

There are, however, some circumstances that significantly counterbalance those facts. The first is the fact that the booking room in which this interview took place was behind many levels of security and was certainly

---

[4] They did, however, move Ms. Baxter to the basement within the building, and the Court will discuss this fact further.

Page 13 of 20

Case 2:13-cr-00186-JPS   Filed 11/15/13   Page 13 of 20   Document 30

not in a public place. The detectives had to lead Ms. Baxter through two locked doors and down an elevator to arrive at the booking room, and thus clearly Ms. Baxter would not have been allowed to leave without a detective to escort her out. Moreover, the detectives informed her that the interview would take place in "lock up," a term that connotes custody. Before escorting her down to the booking area, the detectives asked whether she was carrying any weapons; if she had been, it is likely the detectives would have temporarily confiscated the weapon before taking Ms. Baxter to the booking area. Finally, once in the booking area, the detectives placed Ms. Baxter in a booking room. The booking room was described as very small, having concrete walls, and containing two metal stools and a metal table, and Ms. Baxter testified that the officers closed the door to the room. In sum, after being asked to remove any weapons, the detectives escorted Ms. Baxter on a circuitous route, which Ms. Baxter could not traverse alone if she wished to leave, and ultimately led her to a small, concrete room to question her. These circumstances would, at the very least, come very close to connoting to any reasonable person that the person was in the custody of the police.

There is, however, Seventh Circuit precedent that the Court finds applicable, and which diminishes the importance of those negative factors. First, the simple fact that a suspect must be escorted around a building by law enforcement officers does, itself, establish that the person is in custody. *Ambrose*, 668 F.3d at 965–57 (citing *United States v. Budd*, 549 F.3d 1140, 1145 (7th Cir. 2008)).

Second, this case is in many ways analogous to the Seventh Circuit's decision in *Budd*. 549 F.3d at 1145–46. In *Budd*, law enforcement officers told the suspect that they would like to ask him some questions, and that their interview of him would be voluntary and he was not under arrest. *Id.*, at

Page 14 of 20

Case 2:13-cr-00186-JPS   Filed 11/15/13   Page 14 of 20   Document 30

1145. To facilitate the interview, the officers drove the suspect to the station in a squad car—a factor that would weigh in favor of a finding that the suspect was in custody, and which *is not* present in Ms. Baxter's situation (although, to be fair, the Court notes that the suspect was allowed to ride in the passenger seat of the squad car). *Id.* Upon arrival at the station, the detectives took the suspect upstairs to an interrogation room. *Id.* at 1146. To get there, the detectives utilized an elevator, which could be operated only by magnetic key card, and then took the suspect down a long hallway to an interrogation room. *Id.* These circumstances made clear that the suspect "was not allowed to move throughout the building without one of the officers," and therefore would also have implied that the suspect would not have been permitted to leave without an escort. *Id.* Those circumstances are strikingly similar to the case at hand.

Considering the circumstances in *Budd*, the Seventh Circuit concluded that the restrictions on the suspect's movement were "not extraordinary circumstances, especially in light of the fact that [the suspect] agreed to meet at the police station," and ultimately concluded that a reasonable person in the suspect's position "would have believed he or she was free to leave," making *Miranda* warnings unnecessary. *Id.* Likewise, here, where Ms. Baxter voluntarily agreed to be interviewed at a police station, the restrictions on her movement were not necessarily extraordinary circumstances. Thus, the Court believes that *Budd* counsels strongly in favor of a finding that a person in Ms. Baxter's situation would not believe that he or she was in custody. *Id.*

There is, however, one major difference between this situation and that confronted in *Budd*. In *Budd*, the interview took place in a "soft" interview room, which contained carpeting, wallpaper, and comfortable furniture. *Id.*, at 1145. Here, of course, the booking room used to question Ms.

Baxter was starkly different: the walls and floor were concrete and contained only two metal stools and a metal table. Though the Court has not received pictures of the room, it is quite clear that the booking room was very similar to the prototypical booking room seen on television, and would connote some level of custody.

Moreover, this difference is not entirely irrelevant. In *Ambrose*, the Seventh Circuit paid particular attention to the size and nature of the room in which the suspect was interviewed, noting that it was very large and "contained a table capable of seating more than 20 people." 668 F.3d at 957. The *Ambrose* court drew a specific contrast to the situation the Seventh Circuit confronted in *United States v. Slaight*, 620 F.3d 816 (7th Cir. 2010). In *Slaight*, the suspect was interviewed in a space that was very similar to the booking room in which Ms. Baxter was interviewed. *Slaight*, 620 F.3d at 819. The room in *Slaight* lacked any windows and was no larger than 8 feet by 8 feet, and the Seventh Circuit paid particular attention to the nature of that room in deciding that suppression of the suspect's statements was appropriate. *Id.* at 819.

The similarity between those rooms does not, however, persuade the Court that it should suppress Ms. Baxter's statements under *Slaight*, because there are significant differences between that case and the one at hand. To begin, in *Slaight* there was evidence that the door to the booking room was closed and additionally that one of the officers sat in a chair blocking the door. *Id.* at 821. There is no evidence, here, that the officers similarly obstructed Ms. Baxter's ability to exit the room. While the Court will accept as true Ms. Baxter's assertion that the door to the booking room was closed, there is a significant difference between the mere closure of a door, as here, and the sort of physical blocking that was present in *Slaight*.

More importantly, the *Slaight* court focused on *much* more than the size of the room, alone, in deciding that the suspect's statements in that case should be suppressed. *Id.*, at 819–22. In fact, there were other very serious issues—likely more serious than the issue of the size of the interrogation room—that the *Slaight* court considered important in deciding to suppress the statements at issue. *Id.* Specifically, in *Slaight* the officers broke into the suspect's home with guns drawn to execute a search warrant, transported the suspect to the police station (rather than letting him drive himself), and refused to let the suspect leave when requested to do so to smoke a cigarette. *Id.* Ms. Baxter did not confront any of these additional, very serious issues like the suspect in *Slaight*. Thus, despite the similarity between the room sizes in this case and in *Slaight*, the Court ultimately finds that *Slaight* is distinguishable. *See United States v. Modir Trading*, No. 12-CR-591, 2013 WL 3774005 (N.D. Ill. July 18, 2013).

Additionally, the Court also notes that the detectives provided Ms. Baxter with a clear explanation of why they wished to conduct the interview in the small booking room. Specifically, they informed her that they wished to record the interview and the booking room was the only room with recording capabilities. Thus, to the extent that the size of the room may have implied custody, the Court believes that the clearly-expressed reason for conducting the interview in that room acted to counterbalance that implication. A reasonable person, being led down a floor and through locked doors into a small and very sparse booking room, would likely have reason to believe that he or she was in custody; but, when told that the reason for being taken to the room was to facilitate recording, a reasonable person would also believe that there was ample justification for being present in that room.

On balance, the Court finds that the circumstances in this case weigh in favor of finding that Ms. Baxter was not in custody. She was told that she was not under arrest and voluntarily arrived at the police station. The officers were somewhat accusatory, but did not threaten Ms. Baxter in any way that would intone that she must obey their requests. The officers never prevented Ms. Baxter from leaving. Moreover, in *Budd*, the Seventh Circuit considered many of the circumstances that would weigh in favor of a different conclusion—Ms. Baxter's location in the building and the fact that the detectives would need to escort her out—and determined that those circumstances were ultimately of little importance and did not require suppression. 549 F.3d at 1145–46. Thus, the Court finds that *Budd* controls to substantially limit the import of those negative circumstances. That leaves only the size nature of the booking room to weigh in favor of suppression; and, while that factor is certainly important,[5] under *Slaight*, it was not the controlling factor in that case and the Court, likewise, refuses to consider it the controlling factor, here. *See Slaight*, 620 F.3d at 819–822. For all of these reasons, the Court holds that the circumstances establish that a reasonable

---

[5]Indeed, the Court believes that the Greenfield Police Department may need to seriously reconsider use of this room as a place to interrogate suspects who are not yet in custody, if for no other reason than to avoid so closely skirting the line of custody. The Court's analysis on this matter would have been substantially more straightforward if, for instance, the detectives had interviewed Ms. Baxter in a "soft" interrogation room that is accessible without taking the sort of circuitous and secured path that prevented Ms. Baxter from leaving without an escort. Had they interviewed her in such a room, there would be no question that she was not in custody (absent some serious change in the conduct of the detectives). Likewise, in interviewing suspects in the future, the Greenfield Police Department may avoid the very serious potential for suppression of statements by locating those interviews in a different room as described.

person in Ms. Baxter's position would not have believed he or she was in custody.[6]

The Court is, therefore, obliged to determine that the detectives were not required to provide Ms. Baxter with a *Miranda* warning before this interview. Accordingly, her motion to suppress her statements in this regard is without merit, and the Court must deny it.

4. CONCLUSION

Having determined that Ms. Baxter was not in custody during either of the interviews from which she now seeks to suppress statements, the detectives' failures to provide her with *Miranda* warnings did not violate her constitutional rights. The Court, therefore, agrees with Magistrate Goodstein's report and recommendations (Docket #26), which the Court adopts. Consistent therewith, the Court will deny Ms. Baxter's motion to suppress. (Docket #19).

Accordingly,

IT IS ORDERED that Magistrate Judge Aaron E. Goodstein's report and recommendations (Docket #26) be and the same is hereby ADOPTED; and

---

[6] Ms. Baxter objects to the fact that Magistrate Goodstein did not consider the fact that the recordings of Ms. Baxter's interview at the police station do not exist. (Docket #28, at ¶ 3). The Court does not believe this was an error. In determining whether Ms. Baxter was in custody, the Court needs to ask whether a reasonable person would consider himself or herself to be not free to leave under the same situation faced by Ms. Baxter. At the time of the interview, she would not have known that the recording may ultimately have been destroyed, and therefore this fact is not relevant to the Court's inquiry.

IT IS FURTHER ORDERED that Ms. Baxter's motion to suppress (Docket #19) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 15th day of November, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge